# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JAMES H. OSWALD,

              **Petitioner,**

    **v.**                                           **Case No. 01-C-689**

GERALD A. BERGE,

              **Respondent.**

---

## DECISION AND ORDER ON THE HABEAS CORPUS PETITION

---

James H. Oswald ("Oswald") is a prisoner incarcerated pursuant to a state court judgment of conviction. The charges against Oswald allege that he and his son, Theodore Oswald, robbed a bank, fled from the police, and shot at police officers who stopped their vehicle, killing Waukesha Police Captain James Lutz. Thereafter, Oswald and his son continued to flee, forced their way into a private residence, took a female hostage, and forced her to drive them in her vehicle. Ultimately, the chase ended in a shootout between the Oswalds and law enforcement officers. When it was over, the Oswalds were in custody, and two officers and the hostage sustained gunshot wounds.

After appealing his conviction in the state courts, Oswald petitioned this court for habeas corpus relief under 28 U.S.C. § 2254. The petition was screened in accordance with Rule 4 of the Rules Governing Section 2254 cases, and the respondent was ordered to answer the five grounds for relief set forth by Oswald, who was proceeding pro se at that time his petition was originally filed. Oswald asserted: (1) that he was denied an impartial jury; (2) that he was denied the right to choose his counsel; (3) that he was denied the right to reinstate a not guilty by insanity defense; (4) that he was denied effective assistance of trial counsel when his attorney withdrew the insanity defense;

and (5) that denial of the transcripts from Theodore Oswald's trial infringed on his right to equal protection and due process.

The respondent filed its answer to the petition, admitting exhaustion and timeliness but contending that a writ of habeas corpus should not issue. Thereafter, Oswald retained counsel and the court ordered additional briefing on the petition. In his brief, Oswald does not pursue his earlier claim that he was denied the right to choose his counsel. Accordingly, that ground for relief has been waived and will not be discussed. The pleadings on the remaining claims set forth in Oswald's petition are closed, and it is now ready for resolution.

## STANDARD OF REVIEW

Before turning to the merits of Oswald's petition, the court will address the applicable standard of review, which is disputed by the parties. Oswald contends that the court should apply the standard of review set forth at 28 U.S.C. § 2243 instead of the § 2254(d) and (e) habeas corpus standards with respect to his claims based on jury bias, the denial of witness statements, and ineffective assistance of counsel. (Oswald Br. at 22-25, 39, 41). Section 2243 is less stringent than the § 2254 standards because it lacks the requirement that relief is appropriate only where the state court decision was in some way "unreasonable" or "contrary to" federal law. Instead, § 2243 instructs that the court to hear and determine the facts and dispose of the habeas corpus petition "as law and justice require." This less rigorous standard, however, only applies to claims that were not "adjudicated on the merits" by the state court. Muth v. Frank, 412 F.3d 808, 814 (7th Cir. 2005); Harrison v. McBride, 428 F.3d 652, 665 (7th Cir. 2005).

In the present case, the Wisconsin Court of Appeals' decision clearly constitutes adjudication on the merits of all pending claims. As grounds for his position that the less stringent § 2243 standard should apply, Oswald says that the Wisconsin Court of Appeals decision was based on Wisconsin law, without reference to federal law. (Oswald Br. at 24-25, 39). The Seventh Circuit has previously rejected that position, holding that the analysis of jury bias issues raised by

Theodore Oswald under Wisconsin law constitutes adjudication on the merits for purposes of § 2254(d). Oswald v. Bertrand, 374 F.3d 475, 477 (7th Cir. 2004).

Moreover, the requirement that a petitioner's claim be "adjudicated on the merits" is not an entitlement to a well articulated or even a correct decision by a state court. Muth, 412 F.3d at 814. The Seventh Circuit has stated that a state court summary disposition without *any* discussion of the claims presented constitutes adjudication on the merits. Id. (emphasis added). In addition, the Seventh Circuit reasoned that adjudication on the merits is perhaps best understood by stating what it is not: it is not the resolution of a claim on procedural grounds. Id. The Wisconsin Court of Appeals did not resolve issues raised by Oswald on procedural grounds, and its decision far exceeds summary disposition. Accordingly, it is the opinion of this court that the decision constitutes adjudication on the merits of all claims raised. The court will now turn to the applicable § 2254 standards.

## SECTION 2254 STANDARDS

This court may grant Oswald's petition for habeas corpus relief only if the state court decision:

> (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" standard of (d)(1) requires a state court decision to be "substantially different from the relevant precedent of [the Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405 (2000). For example, a state court decision applying a rule that contradicts the governing law set forth by the Supreme Court would qualify, as would a decision that involves a set of facts materially indistinguishable from a Supreme Court case that arrives at a different result. Id. at 405-06. By contrast, a state court decision that draws from Supreme Court precedent the correct legal

rule and applies it in a factually distinguishable situation will not satisfy the "contrary to" standard, no matter how misguided the decision's ultimate conclusion. Id. at 406-07.

Under the "unreasonable application" prong of (d)(1), relief may be granted if the petitioner shows that, despite identifying the correct rule of law, the state court unreasonably applied it to the facts of the case. Williams, 529 U.S. at 404. An unreasonable application of federal law, however, is different from the incorrect or erroneous application of federal law. Boss v. Pierce, 263 F.3d 734, 739 (7th Cir. 2001) (citing Williams, 529 U.S. at 410). A federal court simply disagreeing with the state court decision does not warrant habeas relief – the state court's application of Supreme Court precedent must be so erroneous as to be objectively unreasonable. Middleton v. McNeil, 541 U.S. 433, 436 (2004); Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

Under § 2254(d)(2), relief may be had where the petitioner demonstrates that the state court made an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Here again, an "unreasonable determination" is more than a determination with which the reviewing court simply disagrees. State court factual determinations are presumed correct, and the petitioner has the burden of rebutting the presumption of correctness by "clear and convincing evidence." Section 2254(e)(1). Rice v. Collins, — U.S. —, 126 S.Ct. 969, 974 (2006)(citing Miller-El v. Dretke, 545 U.S. 231, —, 125 S.Ct. 2317, 2325 (2005)).

And finally, if the petitioner demonstrates constitutional error under subsections (d) and (e), he is not entitled to habeas corpus relief where such error is deemed harmless; that is, the error could not have had a substantial and injurious effect or influence on the jury's verdict. O'Neal v. McAninch, 513 U.S. 432, 436 (1995)(internal citations omitted).

## I. JURY BIAS

Oswald's first claim is that the trial court failed to excuse several allegedly biased jurors from the jury panel, and that this error warrants a new trial. Oswald claims that the voir dire testimony of eight jurors—Rebecca Burkhardt, Patti Hanson, Paul Goede, Ellyn Ash, Paul Abts,

Debora Syverson, Thai Vang, and Phyllis Bey—demonstrates a potential for bias. Oswald says that those jurors should have been stricken for cause because of their pre-conceived opinions about his guilt. Oswald also argues that the court's failure to adequately question Ash, Goede, and Burkhardt about their inclinations and potential biases deprived him of the right to due process. (Oswald Br. at 19-20). In support of this claim, Oswald contends that, as a result of the court's inadequate examination, he was unable to make an informed use of his peremptory strikes.

In reviewing Oswald's petition, this court is bound by the deferential standards set forth in § 2254(d) and may only look at whether the state courts handled the claims presented by Oswald in a manner that was "unreasonable" or "contrary to" federal law. Moreover, this court may only look at claims previously raised in the state courts. Spreitzer v. Schomig, 219 F.3d 639, 644 (7th Cir. 2000)(internal citations omitted). At voir dire, Oswald moved to strike only five jurors—Burkhardt, Hanson, Apts, Sylverson, and Vang. Oswald's appeal challenged the impartiality of those jurors only, with Oswald taking the position that the trial court erred in denying his motions to strike. Oswald did not contest the impartiality of any other juror. Accordingly, this court may not consider Oswald's claims that jurors Ash, Goede, or Bey demonstrated bias or a potential for bias, or that the court did not adequately examine bias with respect to those jurors.

### Impartial Jury Standards

The Sixth and Fourteenth Amendments guarantee the right to an impartial jury. An impartial jury is one that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, rather than preconceptions or other extraneous sources of decision. Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984); Irvin v. Dowd, 366 U.S. 717, 721-23 (1961); see also United States v. McClinton, 135 F.3d 1178, 1185-86 (7th Cir.1998). Jurors, however, need not be totally ignorant of the facts and issues involved. Rather "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin, 366

U.S. at 723. If even one of the twelve jurors is biased, then the jury as a whole cannot be considered impartial. See Parker v. Gladden, 385 U.S. 363, 365-66 (1966).

The Due Process Clause of the Fourteenth Amendment also requires the trial court to ensure that the defendant's right to an impartial jury is not violated. If the court becomes aware of a possible source of bias, the court must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." Remmer v. United States, 347 U.S. 227, 230 (1954); see also United States v. Thomas, 463 F.2d 1061, 1063-64 (7th Cir.1972). Thus, due process means both: (1) a jury capable and willing to decide the case solely on the evidence before it; and (2) a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Smith v. Phillips, 455 U.S. 209, 217 (1982).

### Oswald's Position

Oswald challenges both due process requirements and also cites the Sixth Amendment in support of his claim of jury bias. His challenge to the state courts' determinations that Burkhardt, Hanson, Abts, Vang, and Syverson were impartial jurors is a question of fact that the court reviews under the standards set forth in § 2254(d)(2) and (e)(1). Thompson v. Keohane, 516 U.S. 99, 111 (1995); Wainwright v. Witt, 469 U.S. 412, 428 (1985); Patton, 467 U.S. at 1036; Oswald v. Bertrand, 249 F.Supp.2d 1078, 1097 (E.D. Wis. 2003). Oswald's second argument, that the trial court inadequately explored the potential for bias, is reviewed pursuant the standards set forth in § 2254(d)(1). See Oswald v. Bertrand, 374 F.3d at 477.

### Analysis: Burkhardt and Hanson

The Wisconsin Court of Appeals determined that Hanson and Burkhardt, the two challenged jurors who were seated on Oswald's jury, were impartial even though they said they felt influenced by news coverage. Burkhardt will be discussed first.

**A.** **Burkhardt**

Local news media had been alerted to the Oswalds' crimes as they were ongoing and were able to film the crash of the Oswalds' getaway vehicle, the escape of the hostage, and the police shootout. Those events were rebroadcast extensively. Because of the extremely high level publicity that this case received, the trial court granted Oswald's motion to have the jury selected from La Crosse County, rather than Waukesha County where all of the events took place. In addition, the court conducted an individual voir dire of the potential jurors focusing on their exposure to news coverage of the events. During the voir dire, Burkhardt testified that she formed the opinion that Oswald was guilty after seeing the Oswald news video and discussing the news coverage with her husband. (Tr. 253:50). To investigate those comments further, the trial court conducted the following colloquy:

> COURT: At this point do you believe you could set aside that information in that if you were on this jury the only information that would be available to you would be the evidence and testimony that's actually presented in court during the course of trial, not anything else you may have read or discussed or seen but just what actually would come in during the course of trial and would you be able to view that evidence, listen to the instructions that I would give at the close of trial, apply the evidence to the facts that you believe are properly proven and be able to render a verdict at that time? Do you believe that you'd be able to do that?
>
> BURKHARDT: If I would be objective?
>
> COURT: Yes.
>
> BURKHARDT: I'm not sure.
>
> COURT: Okay. Why is that?
>
> BURKHARDT: I just don't know if – I guess I have a strong feeling that what took place, that the media said took place, actually did take place and I don't know if I could be objective to say that. No. After hearing the evidence I don't know if I could.
>
> * * *
>
> COURT: In this particular case if [the news accounts contained inaccurate information] would that make it easier for you to set aside what may be some of

those media accounts and only listen to the evidence and testimony that occurs in court?

BURKHARDT: I'd be able to – it just depends, I don't know. I guess I'd have to hear what anybody said during the trial. I don't know.

COURT: Would you be willing to listen to all of the evidence and testimony whether it's from the state or from the defense before coming to your own – your own conclusions based upon the evidence?

BURKHARDT: Probably, yeah.

* * *

DISTRICT ATTORNEY: The last question I didn't quite hear your response. You indicated you would be able to wait until all of the evidence is in from both sides and make the decision based on that evidence?

BURKHARDT: I would think so but I still am not sure.

(Tr. 253:50-55). In further explaining her response, Burkhardt stated that she had a gut feeling that Oswald was guilty, based on news coverage of the offense and based on questions that were previously asked in court. (Tr. 253:55). In addition, when asked whether she would decide Oswald's guild based on the evidence, Burkhardt stated "I would hope so." (Tr. 253: 57). In response to further probing about her ability to set aside any previous opinions about Oswald guilt, Burkhardt ultimately stated as follows:

DISTRICT ATTORNEY: I'm not being clear. You want to wait until you hear the evidence before you make that finding of guilt?

BURKHARDT: I guess I should.

DISTRICT ATTORNEY: Would you?

BURKHARDT: I probably could, yeah.

(Tr. 253: 58).

In support of his habeas corpus petition, Oswald says that the foregoing voir dire responses, together with Burkhardt's comments that she felt influenced by the conviction of Theodore Oswald (Tr. 253: 69), indicate that Burkhardt was not impartial. Oswald also cites Burkhardt's statements

about another case that she had previously watched on television. With respect to that case, Burkhardt said she had a "gut feeling" that the defendant committed the offense he was charged with, even though the jury found him not guilty. (Tr. 253:52). At one point, Burkhardt expressed concerns that her feelings about the case would make it difficult for her to sit on Oswald's jury. (Tr. 253: 68).

At trial, Oswald moved to strike Burkhardt for cause based on her voir dire responses. The court denied Oswald's motion, and Burkhardt was later seated on the jury. On appeal, Oswald again argued that Burkhardt's statements indicate that she was unable to serve as an impartial juror. The Wisconsin Court of Appeals rejected that argument and affirmed the trial court decision, noting Burkhardt's statement that she "probably" could set aside her opinions derived from the news coverage. State of Wisconsin v. Oswald, 232 Wis.2d 103, 119, 606 N.W.2d 238, 247 (1999).

This decision by the state court was not "an unreasonable determination of the facts in light of the evidence presented." Some of Burkhardt's responses reflect that she was unsure at times of her ability to set aside the Oswald news video and her resulting opinion that Oswald is guilty of the offenses charged. However, that is not surprising given the unique facts that this case presents. The level of publicity surrounding this case required that the jury be selected from a panel from La Crosse County, with the trial to be conducted in Waukesha County. Even with that effort, the trial court still found it necessary to undergo extensive voir dire addressing the potential for bias. In describing the press coverage surrounding the offenses and the Oswald trials, the federal district court reviewing Theodore Oswald's habeas corpus petition stated as follows:

> The case generated an enormous amount of publicity both in the immediate aftermath of the crime and during the period leading up to the trials of the Oswalds. The serious nature of the offenses, the fact that a local police officer was killed, the existence of the highly unusual video tape (with its echoes of the O.J. Simpson case) and the fact that the defendants were father and son combined to make the case probably the most notorious in the history of Waukesha County.

Oswald v. Bertrand, 249 F. Supp.2d at 1082.

Under the circumstances, it is certainly expected that honest jurors might, at times, respond with some degree of hesitancy when questioned about their ability to view the evidence with an open mind. In Patton, the Supreme Court explained that "unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently." 467 U.S. at 1039. Moreover, jurors undoubtedly bring preconceptions, their thought processes, and their life experiences into the courtroom. As a layperson, jurors may not understand that the existence of preconceptions about a case does not necessarily mean that they are biased.

Burkhardt's responses indicate that she was seriously considering the questions asked of her and giving thought to her answers. Initially, she stated "after hearing the evidence I don't know if I could [be objective]." This was based what she described as strong feelings that the Oswald news video accurately portrayed the offenses. However, after discussing her feelings and the duties of a juror further, and asked whether she would wait to hear all of the evidence before making a finding of guilt, Burkhardt responded "I probably could, yeah." See supra at 9.

That statement is important because bias exists only if a juror's preconceived notion is "irrational or unshakable, so that the prospective juror would be *unable* to faithfully and impartially apply the law." Thompson v. Altheimer & Gray, 248 F.3d 621, 625 (7th Cir. 2001)(emphasis in original)(quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). Here, Burkhardt's final statement that she believed she could put her opinions aside and consider only the evidence presented indicates that her preconceptions were "shakable."

Oswald's contention that an even more unequivocal assurance of impartiality should have been obtained does not comport with the deference that the court must give to the state courts' factual findings. In determining that Burkhardt's responses indicated she would be an impartial juror, the trial court had the benefit of observing Burkhardt during the individual voir dire. The cold record before this court does not reveal the manner in which Burkhardt answered the questions

presented, her facial expressions, or her body language. The manner in which the words are expressed are often as telling as the actual words themselves. Certainly non-verbal language plays a crucial role in not only determining credibility, but also in simply understanding what a person meant to say. See Patton, 467 U.S. at 1038, n. 14. Given the deference required, there is sufficient support in the record for the state courts to find that Burkhardt would be an impartial juror.

In addition, it is clear that the trial court allowed adequate opportunity for Oswald to inquire about any preconceived notions held by Burkhardt. After recognizing a potential for bias based on some of Burkhardt's preliminary comments, the court, the prosecutor, and Oswald all questioned Burkhardt further. Questioning resulted in answers that were responsive and thoughtful, and the colloquy is far from perfunctory. Thus, Oswald cannot satisfy the requirements of § 2254(d)(1), as the court's investigatory efforts were not "contrary to" and did not involve "an unreasonable application of" federal law. Accordingly, Oswald has not satisfied the required burden of proof with respect to either of his claims related to Burkhardt, and the petition will be denied as to this ground for relief.

## B. **Hanson**

On voir dire, Hanson also indicated that she formed the opinion that Oswald was guilty based on news media coverage. In addition, Hanson testified that she believed police officers were more truthful than other people with respect to matters that involve their police work. Oswald cites those voir dire responses, in addition to the fact that Hanson's husband was a police officer, in support of his pending claim that Hanson was not impartial.

The trial court denied Oswald's motion to strike Hanson for cause. In doing so, the court recognized that Hanson said she views the death of a police officer with the same degree of sympathy she would for any other person. (Tr. 251: 283-84.). In addition, the court noted very specific statements by Hanson that she would follow the law and would only consider the evidence presented. (Tr. 251: 284). The Wisconsin Court of Appeals affirmed the trial court decision and

agreed that "[t]here is absolutely nothing in this record to indicate that Hanson had a preconceived opinion of guilt, much less that she would be unable to put any such opinion aside and decide the case based on the evidence presented." <u>Oswald</u>, 232 Wis.2d at 119, 606 N.W.2d at 247.

This court finds that the state court decisions have ample support in the record. While Hanson saw the Oswald news video and indicated that it seemed the persons in the van were guilty (Tr. 251: 253), she also indicated that the video was not of interest to her at the time she saw it (Tr. 251: 236), that she does not remember the video well (Tr. 251: 276), that she would have to see the video again to decide whether Oswald was guilty (Tr. 251: 262), that she thinks the news media often inaccurately reports and exaggerates events (Tr. 251: 237-38), and that she does not form her opinions based on news media accounts (Tr. 251: 245-46). She also felt the news media had sensationalized the McDonald's coffee spill lawsuit (Tr. 251: 238, 245) and said that the inaccurate manner in which the news has portrayed events that involved her husband, a police officer, has lead her to take media reports with a grain of salt, until she can learn more of the facts. (Tr. 251: 237).

With respect to the Oswald news video, Hanson said "Well, I think it looks like he did it but I don't know what they're going to bring out in the trial." (Tr. 251: 245). She also repeatedly said her mind could change. (Tr. 251: 245, 262). In addition, Hanson indicated that she felt bound to hear the state's and Oswald's evidence before making up her mind as to the ultimate issue of guilt or innocence and that, if called as a juror, she would do so. (Tr. 251: 247). When Hanson was asked to clarify what she meant by saying that she "probably" would be able to set aside her preconceptions about the case, Hanson said there would be *no* chance that it would be too difficult for her to wait until the evidence is presented. (Tr. 251: 264). At another point, Hanson expressed recognition of the importance of approaching the trial with a clear conscience and stated she would do so if seated as a juror in Oswald's case. (Tr. 251: 280-81). All of these statements **clearly** indicate that whatever opinions Hanson formed from seeing the Oswald news video, from having

conversations about the incident, or from seeing news accounts can only be described as "shakable."

Moreover, while Hanson stated that she felt police officers were more truthful in the course of their work than other people (Tr. 251: 259-60), the court had not yet given her instructions about witness credibility. Hanson recognized that her view of the case would depend on the court's instructions and indicated that she felt an obligation to follow whatever instructions were given. (Tr. 251: 239-40). Furthermore, when asked if the fact that a police officer was killed would interfere with her ability to be fair and impartial, in light of the fact that her husband was a police officer, Hanson stated:

> HANSON: I would feel the same way if it was a child and, you know, or any innocent person.

> ASSISTANT DISTRICT ATTORNEY: Okay. So the fact that it would be a police officer wouldn't make any particular difference one way or the other?

> HANSON: No. I feel bad that it's anybody.

(Tr. 248.). Hanson also testified that the Oswald news video did not trigger concerns about her own husband's safety and thought that the fact that her husband was a police officer should not prevent her from being impaneled. (Tr. 250, 280.).

Hanson's husband was not a witness in the case, and Hanson was in no way connected to the offense or the officers involved. Absent indication of bias in the record, Oswald is left to argue that Hanson's marriage to a police officer should categorically disqualify her from the jury. This is problematic because the law requires that a juror be stricken for cause despite statements that he will be objective only where the juror's relationship to the case is an exceptionally close one—for example, where a juror is related to one of the parties or has a financial interest in the outcome of case. See United States v. Polichemi, 219 F.3d 698, 704 (7th Cir. 2000)(discussing implied bias). Hanson's marriage to an uninvolved officer is not so close to the case that the court has no choice but to err on the side of caution. See United States v. Graves, 418 F.3d 739, 743 (7th Cir.

2005)(rejecting position that wife of a police officer must be stricken as impartial based on testimony that none of the juror's experiences or relationships would affect her judgment); United States v. Beasley, 48 F.3d 262, 266-67 (7th Cir. 1995)(rejecting claim that juror who has relatives in law enforcement will be more inclined to believe the testimony of law enforcement witnesses and must be stricken as impartial). The state courts' determination with respect to Hanson is far from unreasonable, and the petition will be denied as to this ground for relief.

### C. Vang, Apts, and Syverson

Unlike Burkhardt and Hanson, Vang, Apts, and Syverson were not impaneled. After the trial court denied Oswald's motion to strike, Oswald exercised three of his peremptory challenges to remove those jurors from the panel. In support of his petition for habeas corpus relief, Oswald says that the court's refusal to strike Vang, Apts, and Syverson for cause violated due process. Specifically, Oswald says that Wisconsin law does not require the defendant to use a peremptory challenge to correct the court's failure to strike a biased juror. Because Oswald used three challenges to strike the jurors he says were biased, Oswald argues that he was arbitrarily deprived of what Wisconsin law entitles. This claim is based on Ross v. Oklahoma, 487 U.S. 81 (1988) and State v. Ramos, 211 Wis.2d 12, 564 N.W.2d 328 (1997). The holdings of both of those cases and their progeny are necessary to an understanding of Oswald's position and will now be discussed.

In Ross, the Supreme Court considered whether the trial court's failure to remove a biased juror for cause violated the defendant's Fourteenth Amendment right to due process by arbitrarily depriving the defendant of the full complement of peremptory strikes allowed under Oklahoma law. In analyzing this issue, the Court stated that the right to a peremptory challenge is not guaranteed by the Constitution and, instead, is defined by state law. Whether Ross' rights were denied, therefore, depended on what Oklahoma law provided with respect to the purpose and use of a peremptory challenge. The Oklahoma statute governing peremptory strikes required Ross to correct trial court error by removing a biased juror, if necessary. Thus, despite the court's error, Ross received

exactly what Oklahoma law intended, and there was no basis for his due process claim. 481 U.S. at 90-91.

In State v. Ramos, the Wisconsin Supreme Court looked at whether there can be a due process violation when the analysis proscribed Ross is applied to the Wisconsin peremptory challenge statute. That statute, § 805.08(1), states that "[i]f a juror is not indifferent in the case, the juror shall be excused." Based on that language and Wisconsin case law, the court concluded that the court is obligated to excuse partial jurors and a Wisconsin defendant is not required to use a peremptory challenge against a juror who should have been removed for cause. Ramos, 211 Wis.2d at 19-20, 564 N.W.2d at 332. Because Ramos used one of his challenges to strike a juror who did not demonstrate impartiality, the court held that Ramos had one less peremptory challenge to exercise with unfettered discretion than he should have. Thus, the court held that Ramos was arbitrarily denied a statutorily granted right, which violated due process and required a new trial. 211 Wis.2d at 23-25, 564 N.W.2d at 333-34.

Subsequent to Oswald's appeal, the Supreme Court issued its decision in United States v. Martinez-Salazar, 528 U.S. 304 (2000). Martinez-Salazar argued that he was arbitrarily deprived of the right to peremptory challenges granted to him under Federal Rule of Criminal Procedure 24 when the trial court declined to excuse a biased juror, and Martinez-Salazar struck the juror using a peremptory challenge. The Supreme Court rejected Martinez-Salazar's due process claim, reasoning that *use* of a peremptory to remove an impartial juror does not equate to *loss* of a peremptory. This is the case because the trial court's failure to strike the partial juror did not force Martinez-Salazar to remove the juror. Martinez-Salazar could have allowed the juror to be impaneled and then raised a claim on appeal that the seated jury was not impartial.

Following Martinez-Salazar, the Wisconsin Supreme Court explicitly overruled Ramos in State v. Lindell, 245 Wis.2d 689, 629 N.W.2d 223 (2001). In his petition, Oswald recognizes that Ramos is no longer the governing law, but says that "it is not clear what rule was in effect at the

time" relevant to this case. He makes this claim based on the fact that <u>Martinez-Salazar</u> was decided after his appeal. In addition, Oswald says that this case is not governed by <u>Martinez-Salazar</u> because federal law, analyzed by the <u>Martinez-Salazar</u> Court, does not contain the guarantee set forth in Wisconsin Statute § 805.08(1) that "[i]f a juror is not indifferent in the case, the juror shall be excused." (Oswald Br. at 28-29).

This court can entertain Oswald's application for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Thus, the court must apply federal principles of due process, regardless of which case – <u>Ramos</u> or <u>Lindell</u> – might have been applied by the state courts. <u>Martinez-Salazar</u> clarified the constitutional right to due process when a biased juror is removed with one of the defendant's peremptory challenges. In choosing to remove a biased juror rather than letting the juror be impaneled, a defendant does not lose a peremptory challenge. <u>Martinez-Salazar</u>, 528 U.S. at 315. Rather, the defendant uses the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. <u>Id.</u> at 315-16. "A hard choice is not the same as no choice." The defendant receives what he is entitled to whenever he is permitted to exercise – in whatever way he deems appropriate – the number of strikes allotted. <u>Id.</u> at 315.

With those standards in mind, the court declines Oswald's claim that he was denied the benefits guaranteed to him under Wisconsin Statute § 805.08(1). He exercised all peremptory challenges allotted to him under that statute. Nothing precluded Oswald from permitting Vang, Apts, and Syverson to be impaneled and then raising the issue of jury impartiality on appeal. That is precisely his position with respect to Hanson and Burkhardt. Thus, for all the reasons discussed in <u>Martinez-Salazar</u>, Oswald was not deprived of guaranteed peremptory challenges when he struck Vang, Apts, and Syverson. While § 805.08(1) states that jurors who are not "indifferent in the case" shall be excused, guaranteeing an impartial jury is the goal of every trial judge, federal or state. The fact that § 805.08(1) states the requirement does not mean that Wisconsin defendants are

somehow guaranteed more than a federal defendant such as Martinez-Salazar, who exercised the peremptory challenges governed by Criminal Rule 24.

Furthermore, even assuming that a due process claim was possible, such a claim would not succeed on the facts of this case. The record is abundantly clear that the state courts did not err in declining to strike Vang, Apts, and Syverson for cause. All three jurors indicated that they would set aside any preconceived notions about the case and base their ultimate decision on the evidence presented at trial. While Vang indicated on a written juror survey that knew Oswald was guilty and deserved to be sentenced to life in prison, Vang also stated that his answers on the survey were based on the news media coverage and that he would wait until all evidence was presented. (Tr. 251: 211). In that regard, he *repeatedly* expressed confidence. (Tr. 251: 207, 208, 209, 210, 211, 214). For example, at the very end of the voir dire, Oswald asked Vang whether he would ignore media coverage and be able to find him not guilty if no evidence were presented at trial, and Vang responded "Yes, until all the evidence is presented in the court of law and then I have to weigh as a juror – I have to weigh all the evidence and I will make my judgment based upon the present – what's presented in the court of law." (Tr. 251: 214.).

With respect to Syverson, Oswald's claim of bias is based on the mere fact that two of her sisters and their husbands are law enforcement officers. For reasons already discussed with respect to Hanson, that connection alone is not sufficient to render Syverson a biased juror. See supra at 14-15. In fact, Syverson testified that although her family members were members of law enforcement, she said that "the trial would be based on evidence and the facts presented" and her connection to law enforcement would not affect her ability to listen to the evidence presented. (Tr. 253: 98-99). In addition, unlike many of the potential jurors questioned in this high publicity case, Syverson indicated that she was not exposed to media coverage of the offense and recalled hearing about the case only after receiving her juror questionnaire. (Tr. 253: 100). Ultimately, Syverson

said that she would be able to listen to the court's instructions, apply the law to the facts proven at trial, and withhold her decision until after all of the evidence was presented. (Tr. 253: 102).

Apts expressed similar confidence in his ability to be impartial. Even though he previously worked in law enforcement, Apts replied "yes" when asked if he would be willing to wait and make a decision as to whether Oswald killed a police officer until the evidence was presented and would base his decision on the evidence alone. (Tr. 253: 192). While Apts said that his law enforcement background might affect his perception of the evidence, Apts explained further that he thinks any juror views the evidence in light of their background. (Tr. 253: 195). In addition, he repeatedly said that he would wait to see the evidence presented and would not form an opinion prematurely. (Tr. 253: 195, 196, 200).

The state courts found that Vang would serve as an impartial juror based on statements that he would weigh the evidence presented (232 Wis.2d at 119, 606 N.W.2d at 247), and that Syverson and Apts did not have the kind of relationship that creates a "direct, personal connection to a dispositive issue in the case necessary to render a juror objectively biased." Id. at 120, 606 N.W.2d at 247. The Wisconsin Court of Appeals affirmed that decision and added that there is nothing in the record to indicate that Syverson and Apts believed that police officers are infallible and their backgrounds did not foreclose them from considering Oswald's defense. Id.

In light of all the voir dire responses discussed, the state court decision was not based on an unreasonable determination of the facts. The petition for habeas corpus relief will be denied as to this ground for relief.

## II.  DENIAL OF TRANSCRIPTS

In his second claim for relief, Oswald contends that he should have been provided with the transcripts from the trial of Theodore Oswald at the expense of Waukesha County, because of his indigence. The trial court denied Oswald's request to fund the transcripts on two grounds. First, the court reasoned that, although the transcripts might be helpful, they were not so critical that

failure to provide them would violate due process. (Tr. 248: 149). Second, the court reasoned that Oswald had the opportunity to have an investigator, who had been privately hired by a third party, attend Theodore Oswald's trial but decided not to do so. Citing testimony by the investigator himself, the court stated that Oswald decided that the investigator's time was better spent doing other things. (Tr. 248: 149-150). In light of those two considerations, the trial court denied Oswald's request for approximately $6,000 to fund the cost of the transcripts. (Id.).

On appeal, Oswald argued that the trial court's failure to provide him with transcripts of Theodore Oswald's trial violated Equal Protection because the transcripts would have been available had he not been indigent. The Wisconsin Court of Appeals rejected Oswald's claim for two reasons. First, the court distinguished Oswald's transcript request from that of the defendant in Britt v. North Carolina, 404 U.S. 226 (1971), a case cited by Oswald, on the grounds that Oswald sought the transcripts of the proceedings of a third party, rather than transcripts of his own prior proceedings. Oswald, 232 Wis.2d at 126, 606 N.W.2d at 250. In addition, the Court of Appeals concluded Oswald did not make a sufficient showing that Theodore Oswald's transcript would have been useful to him. Oswald, 232 Wis.2d at 127-28, 606 N.W.2d at 251. The court specifically reasoned that, while a particularized showing of need may not be required, some showing must be made. Because Oswald pointed to no witness whose testimony was in consistent with his testimony at Theodore's trial, the court concluded that Oswald's position amounted to speculation that the transcript was relevant. Id.

### Analysis

The state court decision was not unreasonable or contrary to federal law. In Britt, the Supreme Court addressed whether an indigent defendant was entitled to free transcripts from his previous trial, which had ended with a hung jury one-month prior. The court held that, as a matter of equal protection, the State must provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. 404 U.S. at 227. To

address whether the transcript of Britt's previous trial should be considered basic to his defense, the Court analyzed two factors: (1) the value of the transcript in connection with the appeal or trial for which it is sought; and (2) the availability of alternative devices that would fulfill the same functions as a transcript. 404 U.S. at 227. With respect to the first consideration, the Court stated that the value to a defendant of a transcript of his mistrial should be assumed, even without a showing of need tailored to the facts of a particular case. Id. at 228. The transcript is valuable as both a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses. Id. at 228. Accordingly, the Court concluded that "there would be serious doubts about the decision below if it rested on petitioner's failure to specify how the transcript might have been useful to him." Id.

With respect to the second consideration, the availability of adequate alternatives to the transcript, the petitioner conceded that the court reporter from the mistrial would have read back his notes of the mistrial, well in advance of the second trial, if counsel had made an informal request to do so. Id. at 229. The Court deemed this alternative to be substantially equivalent to a transcript, and the judgment of conviction was affirmed on that basis. Id. at 230.

The position that Oswald asserts takes the holding of Britt and similar Supreme Court precedent to the extreme. While the Court held that Britt was not required to show a "particularized need" to establish the value of his mistrial transcript, the value of a transcript cannot always be assumed. The key is whether the transcript is basic to an adequate defense that is available to defendants with greater financial means. The considerations relevant to that test are two-fold: the transcript must be valuable and must be unavailable to the defendant by other means. In stating that some showing of need is required, and finding no showing by Oswald, the Wisconsin Court of Appeals correctly described the two considerations set forth in Britt. Oswald's position, that no showing of need is required, essentially usurps the consideration of whether the transcript is of value.

For obvious reasons, the production of superfluous or otherwise unnecessary trial materials – at a substantial expense to the public – is not required under the law. Even materials that are of some benefit may not rise to the level that would violate Equal Protection. In fact, as stated by the Supreme Court:

> the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant . . ., but only to assure the indigent defendant an adequate opportunity to present his claims fairly . . . .

Ross v. Moffit, 417 U.S. 600, 616 (1974).

In the present case, the court cannot conclude that the transcript of Theodore Oswald's trial would have been of absolutely no benefit to Oswald for pretrial and trial purposes. Neither can the court conclude that the transcript would have been so important that it would be viewed as basic to Oswald's defense under the circumstances relevant to his case. The Oswald news video depicted Oswald and his son committing the charged offenses, and both defendants were immediately apprehended at the scene of the crime. While witness testimony contributed to Oswald's prosecution, there was certainly substantial evidence of Oswald's guilt that did not depend on the credibility of eyewitness testimony. That consideration must be weighed in conjunction with the fact that Oswald could have had his private investigator attend the trial of Theodore Oswald to gleam what potentially beneficial testimony was presented. This option significantly reduces the gap between Oswald and a defendant of greater financial means. Moreover, had Oswald used his investigator to observe Theodore Oswald's trial, he might have discerned what limited portions of the transcript were most likely to be relevant and reduced the significant expense of requesting the entire trial transcript. Considering all of the evidence, whether a defendant in Oswald's position with financial capabilities would have incurred the substantial expense of obtaining the entire transcript is not a certainty. Not even non-indigent defendants desire to spend money needlessly.

This precludes the court from finding that, because of his indigence, Oswald was somehow deprived of tools that could be characterized "basic."

Moreover, to warrant habeas corpus relief pursuant to § 2254(d)(1), Oswald must rely on "clearly Federal law, as determined by the Supreme Court of the United States." The rule set forth in <u>Britt</u> that Oswald cites is not that an indigent defendant is entitled to the transcript of his co-defendant's trial. Rather, the <u>Britt</u> Court explained the broad principle that the state must provide an indigent defendant with the basic tools for an effective defense. The specific tools that satisfy this obligation are not delineated in <u>Britt</u>, and the Court itself stated that the "outer limits" of its rule are not yet clear. 404 U.S. at 227.

The Wisconsin Court of Appeals denied Oswald's appeal, in part, because no Supreme Court precedent extended the broad rule set forth in <u>Britt</u> to defendants who seek the transcript of a co-defendant's trial. <u>Oswald</u>, 232 Wis.2d at 126-27, 606 N.W.2d at 250-51. While there is certainly a significant degree of overlap between Oswald's case and his son's case, Oswald and his son employed different trial strategies. For example, Theodore Oswald's chief defense was coercion, with the strategy being to portray Theodore as a victim of his abusive and manipulative father. <u>Oswald v. Bertrand</u>, 249 F.Supp.2d at 1082. This defense was obviously not applicable in Oswald's trial. Despite substantial similarities, Oswald's trial was not essentially a "do-over" of his son's trial, as was the case in <u>Britt</u> where the defendant sought the transcript of his previous mistrial. Oswald cites no Supreme Court precedent that would apply to his transcript request and fill "outer limits" left open by <u>Britt</u>. Thus, Oswald has not established clear Supreme Court precedent that mandates a result in his favor.

More importantly, even if Oswald establishes a state court error that violates § 2254(d), he is not entitled to habeas corpus relief if the error was harmless. An error is harmless in the habeas corpus context, unless it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)(quoting <u>Kotteakos v. United</u>

*States*, 328 U.S. 750, 776 (1946)).  In the present case, Oswald has not analyzed how the state court's alleged error relates his defense strategy or explained what consequence the error had on the jury's ultimate verdict.  Given the abundant evidence of Oswald's guilt, and the absence of claims to the contrary, the court is left to assume that any error by the state courts in this regard was harmless.  Accordingly, the court finds that Oswald is not entitled to habeas corpus relief on this basis.

### III.  DENIAL OF WITNESS STATEMENTS

Oswald's next ground for relief alleges that the state courts also violated due process by declining to provide him with witness statements from his son's trial.  His claim is based on the 1993 version of Wisconsin Statute § 971.24(1), which read as follows:

> 971.24. Statement of witnesses
>
> (1) At the trial before a witness other than the defendant testifies, written or phonographically recorded statements of the witness, if any, shall be given to the other party in the absence of the jury. For cause, the court may order the production of such statements prior to trial.

Wis. Stats. § 971.24(1) (1993-94).  Oswald says that the transcribed testimony of witnesses that testified at his son's trial are the type of statements described in § 971.24.  Going further, he says that the state court's failure to provide the statements arbitrarily deprived him of rights guaranteed under § 971.24, resulting in a due process violation.

Bypassing the issue of whether prior trial testimony even qualifies as witness statements, the Wisconsin Court of Appeals rejected Oswald's position on the grounds that Oswald failed to indicate how the witness' statements from the prior trial would have helped his case.  Thus, even assuming that the trial court erred in declining Oswald's request for transcripts, Oswald was not prejudiced.  *Oswald*, 232 Wis.2d at 128-29, 606 N.W.2d at 251.

That decision comports precisely with the harmless error doctrine. Thus, for the reasons discussed in conjunction with Oswald's Equal Protection claim, the habeas corpus petition will be denied as to this ground for relief.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

As for his final ground  for relief, Oswald contends that he was deprived of effective assistance of trial counsel when he was advised to withdraw his plea of not guilty by reason of mental disease or defect ("NGI plea"). The trial court determined that, although Oswald's counsel may have given him deficient advice regarding withdrawal of the NGI plea, Oswald independently wished to change his theory of defense. Thus, Oswald failed to establish the prejudice prong of his ineffective assistance claim and, on that basis, the trial court denied Oswald's post-conviction motion. (Tr. 291: 8-17). The Court of Appeals affirmed the trial court's decision, finding it to be adequately supported by the record. Oswald, 232 Wis.2d at 136 n7, 606 N.W.2d at 254.

### Ineffective Assistance of Counsel Standards:  Strickland and Hill

To prevail on an ineffective assistance of counsel claim, Oswald must demonstrate:  (1) that his attorney's performance fell below an objective standard of reasonableness; and (2) that the deficient performance caused him prejudice. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); see also Roche v. Davis, 291 F.3d 473, 481-82 (7th Cir. 2002); Montenegro v. United States, 248 F.3d 585, 590 (7th Cir. 2001). Courts review counsel's performance under the first prong deferentially, presuming reasonable judgment unless the factual record rebuts such a presumption. See Strickland, 466 U.S. at 689; Matheney v. Anderson, 253 F.3d 1025, 1039 (7th Cir.2001). With regard to the prejudice element, the petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. See Strickland, 466 U.S. at 689; Matheney, 253 F.3d at 1039-40.

In Hill v. Lockhart, the Supreme Court discussed the two-prong Strickland standard in terms of claims based on the defendant's plea. 474 U.S. 52, 58-59 (1985). The first Strickland prong is

no different than in other ineffective assistance challenges. The second prong is satisfied by showing that that, but for counsel's errors, the defendant would not have pleaded in the manner he did and would have insisted on going to trial or, as in this case, insisted on a different plea. See Hill, 474 U.S. at 59. "Where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant . . . will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. Id. at 59. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." Id.

If the court finds that the counsel's alleged deficiency did not prejudice the defendant, under the second prong, the court does not need to consider the first prong of the Strickland test. Strickland, 466 U.S. at 697 ("[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); Berkey v. United States, 318 F.3d 768, 772 (7th Cir. 2003).

**Analysis**

For many reasons, this court is of the opinion that the state court decisions satisfy the standards of Strickland and Hill, viewed with deference under § 2254(d)(1). It is clear from the record that much transpired from the time that Oswald withdrew his NGI plea and the time that Oswald later sought to have that plea reinstated. Oswald was originally represented by Attorney Daniel Fay when he entered the NGI plea on September 20, 1994. To explore that defense, Oswald underwent a medical examination by Dr. Donald Feinsilver. Dr. Feinsilver found that Oswald suffered from two mental disorders, but his ultimate conclusion was that neither of the disorders

affected Oswald in the manner that would support the NGI defense, as defined under Wisconsin law. See Wis. Stats. § 971.15. (Tr. at 289: 31, 40).

Despite Dr. Feinsilver's report, Oswald entered and maintained the NGI plea until his request that retained counsel, Attorney Alan Eisenberg, replace Attorney Fay was granted. Subsequent to his change in counsel, Oswald successfully moved the court to abandon the special plea and enter a regular plea of not guilty to all pending charges. Oswald now contends that his actions were due to Attorney Eisenberg's deficient advice and failure to investigate the NGI plea. Approximately three months later, Attorney Eisenberg withdrew from the case and representation of Oswald was assumed by Attorney Douglas Bihler.

In a post-conviction evidentiary hearing conducted to address Oswald's ineffective assistance claim, Attorney Bihler testified that he wished to explore the NGI plea even though Oswald had previously requested that it be withdrawn, and even though the plea was not supported by Dr. Feinsilver's findings. Initially, Oswald was open to exploring that option as well. In fact, Attorney Bihler procured a preliminary second opinion that was somewhat supportive of the NGI defense and intended to move forward with a change of plea as soon as possible. (See Tr. at 289: 155-57, 174-75). However, by March 30, 1994, Oswald had changed his mind and challenged Attorney Bihler's ability to represent him on the grounds that Attorney Bihler wished to pursue a NGI plea and Oswald did not. (See Tr. at 289: 171, 177-82). On that basis, the court granted Oswald's request to proceed pro se and appointed Attorney Bihler as standby counsel. (Tr. 289: 182).

Based on the foregoing events, it was not unreasonable for the state courts to conclude that Oswald would have foregone the NGI plea regardless of Attorney Eisenberg's advice. With Attorney Bihler as his counsel, Oswald was encouraged to pursue the NGI plea and declined to do so. In fact, arrangements to further that trial strategy were underway until Oswald adamantly expressed his opposition.

While Oswald eventually moved the court to reinstate the NGI plea, he did not do so until just a few days before trial, and there is evidence that Oswald's motion was not made in good faith or based on a sincere belief that the NGI plea would prove successful. In fact, the record reflects that Oswald's eleventh hour request was made only after he told Attorney Bihler that he viewed the NGI plea as a scam or a ploy and that he hoped to "really try to screw things up" by requesting to reenter his NGI plea so late in the litigation. (Tr. 289: 182-83).

Thus, even if Attorney Eisenberg failed to adequately investigate the NGI plea, and gave Oswald deficient advice, Oswald was not prejudiced. A NGI plea was strongly recommended to Oswald by Attorney Bihler, but that recommendation fell on deaf ears. In fact, Oswald himself concedes that Attorneys Fay and Bihler were trying to develop the NGI defense until the time of their discharge. (Oswald Br. at 43). Given the circumstances, the trial court quite reasonably concluded that Oswald was not prejudiced because "there's no reasonable probability that the outcome would have been different. . . . what occurred was exactly what Mr. Oswald wanted to occur. He did not want to pursue an NGI plea." (Tr. at 291: 17). The Court of Appeals found that decision to be supported by the record and, based on the circumstances, those decisions do not come close to what would warrant habeas corpus relief under § 2254(d). Accordingly, the petition will be denied as to this final claim and this case dismissed.

For all the reasons discussed herein, the court now enters the following order on the petition for habeas corpus relief:

**IT IS THEREFORE ORDERED** that the petition for a writ of habeas corpus is **denied** and this case is **dismissed** on its merits.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2006.

BY THE COURT:

s/Aaron E. Goodstein
AARON E. GOODSTEIN
United States Magistrate Judge

Case 2:01-cv-00689-AEG   Filed 06/21/06   Page 27 of 27   Document 26